ZEBULON KIRBY, APPELLEE, *v.* JUSTUS INGERSOLL AND
NEHEMIAH INGERSOLL, APPELLANTS.

The implied authority arising from the ordinary contract of copartnership does not authorize one of the partners, without the assent of his copartners, to make a general assignment of the partnership effects, to a trustee, for the benefit of creditors, giving preferences to some creditors over others. *Held,* therefore, that such an assignment made by one of two copartners, without the knowledge or assent of the other, who was present, attending to the business of the firm, and might have been consulted, was void.

It seems, however, that the power in one partner, to make such an assignment, may sometimes be implied from circumstances, showing that it was intended to be conferred.

Where one of two partners, without the knowledge or assent of the other, who was on the spot, and might have been consulted, assigned all the partnership effects to a trustee, for the benefit of the creditors, preferring some of them over others, and it appeared from the circumstances, that the assignment was made without any pressing necessity, and with a view to dissolve the copartnership, and to deprive the other partner of all power in the management and disposition of the partnership property; *Held,* that it was a *fraud* upon the rights of the partner who did not join therein, and was, therefore, void,

*Held,* further, that the fraud tainted the whole transaction; and that the assignment gave to the trustee no lien or security upon the partnership effects, for the payment of a debt due to him, which was preferred, by the assignment, over the claims of the other creditors.

It is no objection to the appointment of a receiver to take charge of partnership effects, that one of the partners has assigned his interest therein to a third person.

APPEAL from the Court of Chancery. *(Vide* S. C. Harr. Ch. R. 172—193.) The bill was filed September 5, 1839, and states that Kirby, the complainant, and the defendant, Justus Ingersoll, on the 9th November, 1833, entered into copartnership in the business of tanners, curriers and dealers in leather; that no written articles of copartnership were executed, but, by the terms of the verbal agreement between them, the business was to be

carried on at Detroit, under the name of Ingersoll & Kirby; that they were to be equally interested in it, and to devote their time and skill to its management; and the profits were to be divided equally between them; that the partnership was to continue during the pleasure of the parties.

That immediately afterwards they purchased stock in trade to a large amount, including the stock and business of a firm then trading in Detroit, under the name of Justus Ingersoll & Co., and undertook to pay the liabilities of said firm, one of which was a debt due to the complainant of about $900, which thus became so much capital paid in by the complainant. That, when the copartnership was formed, said Justus resided at Medina, New York, and he continued afterwards to reside there, and to devote his time exclusively to his own private business, for his own exclusive benefit, until September, 1838, when he removed to Detroit. That the complainant, during the existence of the copartnership, devoted his whole time to the business of the firm. That the business was prosperous and lucrative, and continued to be carried on without any material disagreement, until about the month of November, 1838, when some difference of opinion as to the mode of conducting it arose between the partners, and said Justus expressed a desire that it should be closed. That complainant interposed no objection, but expressed his willingness to dissolve the copartnership as soon as the business of the firm could be placed in a situation to secure to the creditors the speedy payment of their debts. That, immediately thereafter, complainant directed his whole attention to the collection of the outstanding debts due to the firm, and to the payment of its liabilities, which were reduced, within ten months previous to the filing of the bill, nearly $11,000.

That, since the said month of November, 1838, com-

plainant and said Justus had, from time to time, with a view to close the copartnership business as fast as the same could be done without hazarding the interests of the creditors, or of the firm, made amicable divisions of property of the firm, each taking portions of the same to hold in severalty.   That, among the property so divided, were 540 hides, of the value of about $2,000, set apart to said Justus, which he shipped to Medina, New York, and 728 sides of upper leather, of about the same value, set apart to complainant, which were packed away, apart from the partnership property, but in the same building where the business was carried on, and a building contiguous thereto; that the partners were not charged in the books of the firm, with the property so set apart to each by such division.

The bill further states that, while the business was thus in a train of final settlement, to wit, on the 27th day of August, 1839, said Justus, without any previous consultation with complainant, and without his knowledge or consent, made an assignment to the defendant, Nehemiah Ingersoll, wherein, after reciting that the said firm was justly indebted to James Abbott for rent accruing on a certain indenture of lease which the said Nehemiah had become liable to pay, by reason of a certain bond signed by him for said firm;—that he was also liable to the amount of about $10,000, on a bond executed by him to the Farmers and Mechanics' Bank to secure advances made to said firm;—that he was also liable as endorser for said firm, of their note for $2,000; that said firm was willing to secure and indemnify said Nehemiah, and also to pay him the sum of $2,000, due him for advances to said firm; and also to secure the payment of all the other just debts, out of the property of said firm,—the said Justus, using the name of the said firm of Ingersoll & Kirby, assigned to said Nehemiah the stock in trade, or the

greater proportion of it, amounting to about $9,000, and notes and accounts belonging to said firm to the amount of about $6,000, and gave said Nehemiah full authority to sell and dispose of all the said property, and to collect all the said debts, and apply the proceeds, *First.* To the payment of himself the sum of $2,000: *Second.* To pay off and satisfy any debts due from said firm, which he was in any manner bound to pay: *Third.* To pay off any other debt or debts justly due or owing by said firm; to retain out of the moneys collected a reasonable sum for his services; and to pay over any balance to said Justus and complainant, their heirs and assigns.

The bill further states that said Nehemiah is a brother of said Justus, and charges that, instead of being a creditor, he was in fact a debtor to said firm; that said Justus was largely indebted, individually, to said Nehemiah, for money borrowed of him; and that the assignment was made by said Justus, not for the purpose of securing any debt due from said firm to said Nehemiah, or of indemnifying him for any liability for said firm; that said Nehemiah had been the endorser for said firm during its whole existence, but that, at the time of making the assignment, there was no liability for the firm outstanding against him, except as collateral to the debts of the firm; that the indebtedness to the Farmers and Mechanics' Bank did not exceed $6,700, no part of which was then due; and that the firm was in good credit and able to pay all its debts, and had been so ever since it commenced business.

The complainant further alleges in the bill, that, since the assignment, he has been prevented from attending to the business of the firm; that when he applied to examine the partnership books, he was abruptly refused, and was told by said Justus that the papers, books, notes, and accounts were left in his, said Justus's, charge and care, by said Nehemiah, and that the complainant could not have

access to them; and that, immediately after the assignment, said Justus caused a notice of the dissolution of said copartnership to be published.

The bill further states that there is a large amount of property, consisting of leather, hides, &c. and other stock belonging to said firm, and not mentioned in the assignment, now in the possession of the defendants; and also of notes and accounts due the firm, and not mentioned in the assignment, on which payment has been demanded by said Nehemiah; that some of the stock of the firm consists of hides in the process of tanning, which require the constant attention of a large number of hands to fit them for market, and that there was danger that they would be lost unless some person duly authorized should take possession of the same; that the assignment rendered it impossible for the complainant to continue in the partnership business; that it placed the available assets of the firm beyond his power; that he had offered to join in an assignment of said assets, for the purpose of paying the just debts of the firm, to any person who would accept such trust, and was capable of performing the duties required; but had refused to ratify the assignment to said Nehemiah; that no time was limited for the closing of the trust created by said assignment, and no security taken for the faithfulness of said Nehemiah; that he was irresponsible; that he was disposing of the property assigned; that he had collected and received moneys belonging to the firm, and had sold some of the assets on credit; and that there was danger that the property of said firm would be squandered and the creditors defrauded, &c.

The bill prays that the partnership may be dissolved, and a receiver appointed to take charge of the effects; and that the defendants account, &c.

The answer of the defendants admits the partnership; the purchase of stock, &c. of the firm of J. Ingersoll &

Co. to the amount of $15,000; the indebtedness of that firm to complainant in about the sum of $900; that this sum was credited to complainant as so much capital paid in, at the time of entering into copartnership; that complainant resided at Detroit, and conducted the business of the firm, as stated in the bill; and that said Justus resided at Medina, New York, and was engaged in attending to his own business up to September, 1838, when he removed to Detroit; but states that, by the partnership agreement, said Justus was relieved from devoting any part of his time to the business of the firm; states that the firm was indebted to him, for the tanning of hides at his tannery in Medina, and for leather, &c. furnished; that the business of the firm was extensive, but that said Kirby kept the books in a negligent and careless manner; that he neglected to keep any cash book, and refused to settle up the partnership affairs on any reasonable terms; that said Justus had often solicited a dissolution of the firm, but that said Kirby, whenever it was proposed, manifested a petulant and resentful spirit; that being satisfied that said Kirby was committing fraudulent acts in the management of the business and property of the firm, in the last part of August, 1839, he told the complainant that he should make an assignment of the partnership property, to pay the debts of the firm, and dissolve the partnership, to which he made no objection; that, on the 27th day of August, 1839, he made the assignment set forth in the bill; that said Kirby had often before expressed his willingness that said Justus should sell and transfer his interest in the partnership to said Nehemiah; and that he, said Kirby, should be fully satisfied with any arrangement which said Nehemiah should recommend for the final settlement and adjustment of all the affairs of said firm.

The answer further alleges, that said Nehemiah Ingersoll, from time to time, advanced money to said Justus

for the use, and on the credit of said firm, for which there was due him from the firm at least $1,600 ; and that said Nehemiah was not the debtor, but was the creditor of said firm, at the time of the assignment, to the amount of the last mentioned sum ; that he was liable for said firm to the Farmers and Mechanics'· Bank in the sum of $6,700.00, on his bond to the bank, and was also liable for rent to James Abbott.

The defendants allege further, that the assignment was made for the purposes expressed therein, and no other ; that it was made after the complainant had notice of the intention of Justus Ingersoll to make an assignment of the partnership property, and in pursuance of the lawful authority of a partner over the effects of the firm ; and they deny that the firm was in good credit when it was made. The answer denies that the complainant ever offered to join in an assignment, and declares that soon after the assignment was made, Kirby called at the store, and was informed of the assignment, and the substance thereof, and that he replied that he presumed it was all right, but wished to take the advice of his counsel upon it, and would probably agree to it all. The defendants further say, that they know of no partnership property or demands belonging to said firm, not embraced in the assignment, unless it be real estate, or a few judgments rendered before justices of the peace, of trifling amounts ; and charge that the complainant had in his possession money or effects belonging to the firm for which he has never accounted. They allege that said Nehemiah Ingersoll is fully responsible as to property, and able and willing to execute the said trust ; and deny all fraud, and all effort at secrecy, in making the assignment.

On the hearing, upon the bill and answer, of a motion made in the Court below, by complainant, for the appointment of a receiver, the Chancellor decreed that the assign-

ment be declared void, and that it be referred to a master to appoint a receiver; and that said Nehemiah Ingersoll deliver over to, and account with said receiver, for whatever had come to his hands by virtue of the assignment.

From this decree the defendants appealed to this Court.

*H. N. Walker* and *D. Goodwin*, for complainant.

*A. D. Fraser*, *J. M. Howard* and *Witherell & Buel*, for defendants.

FELCH, J. delivered the opinion of the Court.

The partnership between Justus Ingersoll and Zebulon Kirby was a limited one, being confined to the trade and business of tanners, curriers and dealers in leather, in the city of Detroit. The power of a partner in such firms, over the partnership property, is stated in general terms, in all the books, and would seem to be well settled. Within the scope of the partnership business, and for the purpose of carrying on that business, with a view to the making of profit for the benefit of the firm, the power of disposing of the property or effects is undoubted. So, also, within the same legitimate scope of such power, is the contracting of debts in the regular course of business of the firm, and the payment of debts, either by the use of the money or the property of the firm. The disposition of property in such case and for such object, is in accordance with the interest of the firm, is within the acknowledged power of a partner over it, and must be presumed to be done to advance the interests, and to continue the business of the firm. But when a conveyance is made by one partner, of all the partnership effects, to a third person, in trust, without the knowledge or consent of his partner, the effect of which must almost necessarily be to

close the copartnership business, another and more difficult question is presented.

In looking at the decisions of courts on this question, I shall inquire—

1. Whether one partner has the power thus to dispose of the partnership effects ; and,

2. If so, is the case presented one in which there has been a proper *bona fide* exercise of that power ?

1. In Story on Partn. § 101, it is said that it may well admit of some doubt, whether the power of a partner extends to a general assignment of all the funds and effects of the partnership, for the benefit of creditors.    In *Pierpont* v. *Graham*, 4 Wash. R. 232, the same doubt is,expressed, and the point left undecided.    In *Anderson* v. *Tompkins*, 1 Brock. R. 456, Chief Justice *Marshall* held that such an assignment was good, if the transaction was free from fraud.    The general doctrine that such power was an incident to the partnership relation, is asserted by the court; but the point decided was, that, under the circumstances of that case, the power, by assent of the other partner, must be presumed.    Murray, the partner who did not join in making the assignment, was beyond seas when it was executed ; and it is stated by the court that he "had a right to be consulted.    Had he been present he ought to have been consulted.    The act ought to have been, and probably would have been, a joint act. He had, by leaving the country, confided every thing respecting their joint business to Tompkins, who was under the necessity of acting alone."    And again—it is said that, "should goods be delivered to trustees for sale, without necessity, the transaction would be examined with scrutinizing eyes, and might, under some circumstances, be impeached.    But if the necessity be apparent, if the act is justified by its motives, if the mode of sale be such as the circumstances require, I cannot say that the part-

ner has exceeded his power." And, in another part of the opinion, it is asserted of the absent partner that, "in leaving the country, he must have intended to confide all his business to the partner who remained for the purpose of transacting it."

In *Dickinson* v. *Legare*, 1 Dessaus. R. 537, the Court of Chancery of South Carolina, decided against the validity of such an assignment. That assignment, however, was made by one of the partners, then in England, a prisoner of war, while the other partners and the property assigned were in this country, to secure the payment of a particular debt. This decision is said to be overruled in *Robinson* v. *Crowder*, 4 M'Cord's L. R. 519. I have been unable to obtain the report of the last case, or to ascertain the precise point which was decided by the court.

*Mills* v. *Barber*, 4 Day's R. 428, decides simply that one partner has power to transfer a chose in action to a creditor of the firm, with authority to collect and apply the proceeds to his own use.

In *Harrison* v. *Sterry*, 5 Cranch's R. 289, an assignment of certain partnership property and choses in action, to a trustee, was made by one partner in New York, the others being and residing in London. The object of the assignment was to sustain the firm in the embarrassments into which they had fallen, and to enable them to continue their partnership business. The objection that the partner had no power to make the assignment, was overruled by the court. They put their decision on the ground that the whole commercial business of the company in the United States, was necessarily committed to Robert Bird, the only partner residing in this country, and he had the power to collect or transfer the debts due to them. They declare the assignment to be an act of this character, and within his power as managing partner.

In *Egberts* v. *Wood*, 3 Paige's R. 517, the Chancellor of

New York held, that it was the better opinion that one partner might assign the partnership effects, in the name of the firm, for the payment of the debts of the company, although by it, a preference was given to one set of creditors over another; but he declined deciding the question as to the validity of an assignment made to a trustee by one partner, against the wishes and without the consent of his copartner.

In *Havens* v. *Hussey*, in the same court, 5 Paige's R. 30, the question received a direct adjudication. An assignment was made of all the partnership effects to a trustee, in trust, to pay certain preferred creditors of the firm. It was made in the name of the firm, by one of the partners, without the consent of the other, and against the known wishes of her son, who was present, and attended to her interests. The Chancellor held that the implied authority arising from the ordinary contract of partnership, did not authorize such an assignment. The assignment was declared void, and a receiver appointed.

In *Hitchcock* v. *St. John*, 1 Hoffm. R. 511, Mr. Vice Chancellor *Hoffman* examined the same question very fully, and decided that there was no power in one partner, to make an assignment of the character above indicated.

In the argument of this cause it was strongly urged in support of the power of one partner, to make the assignment in question, that the authority of each partner extended to the full right of disposition of all the partnership property;—that he might sell the whole, even though it should render a dissolution necessary; and that, in fact, a sale of the whole property would not be, or necessarily cause a dissolution of the partnership. This general power is not denied, but it must be confined to the legitimate scope of the partnership business. Within the limits of the regular business of the firm, the power is undoubted.

One partner in a store may sell to purchasers every article of the stock in trade, either for cash or in payment of a creditor or creditors. He may do this although it should be out of the power of the firm to replenish the stock, and a dissolution would be the consequence. The inquiry is not what is the consequence of the act,—for each has trusted the other to exercise his own judgment,—but is the act itself within the limit of his power? Is it within the scope of that agency, which each partner bestows upon his fellow, with a view to carry on the business of the firm, for the mutual benefit of all? The power in all of these acts of one for all, has its origin in the consent, or presumed consent, of the other partners. But what consent is presumed to be given to one partner to make an assignment of all the property and effects of the firm, which withdraws the property from the control of his copartner, and places it in the hands of a trustee of his own choice, with a view to a distribution of the proceeds among creditors preferred by him? Can it be said that, in an ordinary partnership, without special stipulations, and without a showing of acts of the parties, or of special circumstances, to warrant the presumption of the assent of the other partners, each is invested with full power to bind the others, by such a transaction? While both partners are present, and attending to the ordinary business of the firm, will it be said that each is entrusted by the other with this extraordinary power of closing, at the same time, the business of the firm, and depriving his copartner of all participation in the sale of the property? I can scarcely think that such power is ever intended, or understood to be given, by one partner to another. The law has fixed the rights and powers of partners on the dissolution of a firm, with as much precision, as in carrying on the business of the firm. Under the partnership existing between Inger-

soll and Kirby, either had the power at will to dissolve the connection. In that event, the law fixed the rights of the individual partners to the property ; it contemplates its application to the payment of the debts of the firm. It presupposes the individual exertions, and the exercise of the judgment of the former partners, in the sale and application of it; and it affords to each a full remedy for any misconduct, or fraudulent act of the others in reference to it, by enabling him to procure the appointment of a receiver, and through him a proper application of the assets.

The partnership relation implies, then, the full right in each partner of disposing of the entire property of the firm, in all the ordinary methods pertaining to the business, for ready pay, on credit, or in payment of the debts of the firm. It implies, also, the power, in the manner recognized by law, to dissolve the firm ; and the right to have the assets duly applied, either by the mutual acts of the parties, or by the interference of a court of chancery. But the power of dissolving the firm, and at the same time excluding the other partners from all participation in the administering of the property, by the appointment of a trustee for preferred creditors, it seems to me can hardly be presumed among the powers granted by the partners to each other. It would rather seem that the contract was made in reference to the rights of parties as secured by law on a dissolution, than that a power was given so totally at variance both with the law and the rights of parties.

I speak here of the power of one partner, implied by law from the mere partnership relation. Power beyond this may be given, in a particular instance, or may be inferred from the conduct and course of business of the partners. The circumstances in which one partner is placed, may sometimes give him powers to do what otherwise the law would not imply. The circumstances must,

in such case, be such as to authorize the presumption that such power was conferred by the other partners. Of this class appears to have been the case of *Anderson* v. *Tompkins*, above cited, where the partner who did not join in the conveyance, was abroad. It is expressly declared that, if he had been present, he should have been consulted; and, by leaving the country, he had confided full powers, in the acting partner, to manage the joint business. The case of *Harrison* v. *Sterry*, cited above, was also of the same class; and the power was sustained with similar remarks from the court. This case, however, was not an assignment of *all* of the partnership property, nor was the assignment made with a view to dissolve the firm.

In case of the absence of one partner out of the country, confiding the whole management of the business of the firm to another, who remains in full charge, it does not seem to me to violate any rule, to presume that the former has given to the latter more ample power than he would possess if both were present, personally overseeing the business. The absent partner, having withdrawn both his personal services and advice, may well be supposed to have invested the other, not only with the ordinary power of managing the affairs, but also with all powers necessary to be exercised in the case of any extraordinary emergency. When embarrassments had fallen upon a house thus situated, and an assignment had been made by the acting partner, which was dictated by prudence, justified by its motives, and unexceptionable in its mode, I see no reason to quarrel with the inference, that such power was conferred by the absent, upon the acting partner. It would be, however, not upon the principle that such power was necessarily conferred or implied, in the very relation of partners, but that the extraordinary circumstances of the case showed a power to manage the

partnership concerns, conferred by the absent partner, which would extend to the act in question. And it is not a little remarkable, in the extensive investigation which this cause has received, that no case is cited in which an assignment has been sustained, which was made by one partner while both partners were present, attending to the business of the firm; while the adjudications cited from 5 Paige's R. and 1 Hoffm. R. directly decide the question, and deny the validity of such an assignment.

It seems to me to follow from this view of the law of the case, that it is not within the ordinary powers arising from the partnership relation, while the business of the firm is proceeding in the usual manner, and both partners are present and attending to the affairs of the firm in the ordinary manner contemplated by their partnership agreement, for one partner to make an assignment to a trustee for the benefit of preferred creditors, with the design of putting an end to the partnership, and closing up its concerns. But the power to make such assignment may be conferred by one partner on another, or may, like any other power, be inferred from the conduct of the partners, their manner of doing business, and the circumstances in which they place themselves in reference to the business of the firm.

2. If it be admitted, however, that the power of one partner is perfect to convey the whole partnership effects, to a trustee, to pay preferred creditors, that power could only be exercised in a case free from all fraud. In the exercise of all the powers conferred by one partner on another, to bind the firm by his acts, perfect good faith in regard to each is required; and if a third person knowingly participates in a transaction with one partner not in good faith to another, the transaction cannot be sustained. Thus, the power to buy goods to an unlimited amount, in the name and on the credit of his firm, exists

in each partner of a mercantile house ; yet, if such goods were bought by one partner to apply to his private purposes in fraud of the firm, and the vendor knew it, he could not recover the amount of partners. So, the power to give the notes or bills of exchange of a firm, is within the authority of each partner; still, if he fraudulently gives them for his own private purposes, and the payee knows of the fraud on the firm, the latter will not be bound. These are familiar instances of the principles applicable in such cases.

In the case before us, it is evident from the pleadings, that the assignment was made by the partner who had not usually been the acting partner; that it was of all, or nearly all, the effects of the firm, with the lease of their place of business; that it was made to the brother of the assigning partner, who resided in the same place; that it was made with a view to dissolve the partnership, and had the effect to prevent their proceeding with business ; that the complainant was excluded from examining the books of the firm or controlling the property ; that the assigning partner had control as the agent of the assignee ; that the complainant was present and attending to the business of the firm, but was not consulted nor did he consent to this assignment, although some general conversation about an assignment is stated to have been had with him at previous times.

Two things, it is said in *Pothier*, must concur to enable a partner to dissolve a partnership ; 1. The renunciation must be made in good faith; and, 2. It must not be made at an unreasonable time. Story on Partn. 271. A transaction dissolving a partnership in so extraordinary a manner, and excluding the other partner from all enjoyment of the right to participate in the distribution of the effects, and giving to the brother control of all the property for the benefit of preferred creditors, appears to me

to be clearly a fraud on the rights of the complainant. No necessity justified it, and no authority was given by the complainant, and no act appears to have been done from which such authority can be inferred. (The complainant was present, and might have been consulted.) The very object was evidently to shut out the complainant from the power over the partnership property and concerns, with which the law has invested each partner on such dissolution. If sustained, the effect is not only to exclude the complainant from such control over the property, but also to deprive him of the usual right to have his interests protected, and the affairs of the firm settled, under the impartial administration of officers appointed for that purpose by a court of equity.

From the very nature of the transaction, the trustee cannot be deemed ignorant of the object or effect of the assignment. His aid in carrying out the design of the assigning partner, was but to exclude the complainant from his legal rights, and must be deemed to be in fraud of those rights. I would not be understood as imputing to the highly respectable parties in this case, a premeditated or wicked intention to destroy or injure the interest of the complainant; both the assignor and assignee might have supposed that the assignment was clearly within the powers conferred upon the former by the partnership relations; but we are here to settle a general principle respecting the legal rights of partners, which shall apply to all cases as well as to the present. And when we are satisfied upon the facts appearing in the case, that such an assignment made and accepted must operate as a fraud on the complainant's rights as a partner, it is our duty to declare such an assignment both unauthorized and void.

It is contended by the defendants that the assignment is at least good for the share of the party who executed it, in the property of the firm. But the property must

first be applied to pay the debts of the firm.   It is a fund especially devoted to that purpose; and the separate interest of each partner is only such as remains after the partnership debts are discharged.   For this purpose the complainant asks that it go into the hands of a receiver. There can be no claim to the individual share of the other partner which should prevent this application.   Story on Partn. 135 ;  Coll. on Partn. 77.

Again—it is urged that the assignee was a *bona fide* creditor of the firm, and that the assignment should be sustained so far, at least, as to give him security for the payment of his debt, out of the assets, in *preference to* other creditors.   The assignment in trust is entire ; and we have already seen that it must be regarded as fraudulent,'in its effects upon the rights of the complainant.   This has tainted the whole transaction, and rendered it ineffectual to sustain rights attempted to be secured by it, to the assignee.   It is not the case of an instrument good in part and bad in part ; the fraudulent design attaches itself to the entire transaction, and he who participates in it, can take nothing under it.   If the law was otherwise, the principle asserted, as to the right of one partner to make such a conveyance, would be ineffectual to secure the interests of the other partners.   A creditor, or a pretended creditor, might always be chosen as the assignee, if that alone was sufficient to sustain the assignment, and if it was sustained for that purpose, and the trustee allowed, as is here claimed, to retain the property for the purpose of selling and applying the proceeds to the discharge of his claim, the whole evil of such a conveyance would be sanctioned.

The decree of the Chancellor was, in the opinion of this Court, correct, and it must be affirmed, setting aside the assignment and declaring it void, ordering a reference to a master to appoint a receiver, and that the trustee deliver

over the property to the receiver, and account for whatever has come to his hands by virtue of said assignment. And for the purpose of carrying into effect this decree, the cause must be remanded to the Court of Chancery.

WHIPPLE, J. dissenting.  The only question presented for the decision of this Court is, whether the assignment executed by Justus Ingersoll, and set forth in the pleadings, can be sustained.  I agree with the Chancellor, that no question of greater practical importance has ever arisen since the organization of our state government; and I have, therefore, felt bound to examine it with great care and deliberation, as it is probable that its adjudication in the present cause, will be regarded, hereafter, as authoritative.  In the case of *Brown* v. *Kellogg et al.* the Supreme Court of the late territory decided the identical question upon which the judgment of this Court is now to be pronounced, and that decision was acquiesced in, until the filing of the bill in the present case.  We are not bound by that decision, although, *upon a doubtful question*, it should have its just weight, as it might affect rights acquired under the impression that a rule prescribed some years since, and acquiesced in, would not be disturbed.

I propose, very briefly, to test the validity of the assignment made by Justus Ingersoll, by those general principles which govern and control mercantile copartnerships, and by the authorities which were cited by counsel on both sides upon the argument.

No principle is better established, than " that the transactions of partners, in which they all severally and respectively join, differ in nothing, in respect to legal consequences, from transactions in which they are concerned individually."  Gow on Partn. 52; Watson on Partn. 167.  Let us now consider in what instances the act of one partner shall be construed to be the act of all.  It

may be laid down, as a principle resulting from the contract of copartnership and the relation growing out of such a contract between the parties to it, "that partners are bound universally by what is done by each in the course of the partnership business." When acting within the rule thus prescribed, each partner is considered not merely as a principal, but as the general and authorized agent of the firm; so that, every act which the copartners might jointly do, may be lawfully done by each, in the name of the firm. The very existence of commerce may be said to depend upon the recognition of this principle ; for, without it, mercantile copartnerships would, to a great extent, cease to exist. One partner may, in the name of the firm, draw, endorse and accept negotiable instruments ; may induce a joint responsibility by any contract or agreement for the purchase or sale of goods ; he may borrow money ; he may pay the debts of the firm ; and to this end has authority to sell any or all of the copartnership property ; he may employ an agent or agents in managing the affairs of the firm ; he may authorize such agent or agents to draw, endorse or accept bills in behalf of the firm ; he may even bind the firm by an act not having relation to their joint business, provided it receive their assent express or implied ; he may even bind the firm in many cases, upon an agreement made for his own special benefit. Over the whole copartnership property, one partner " may exercise the *jus disponendi*, and in the absence of fraud, the sale will be binding upon the firm." Gow on Partn. 68. " He may pledge the partnership effects, and the pledge will bind his copartners." Gow on Partn. 70. Such is an enumeration of some of the powers which each partner possesses. These powers result from the nature of the connection of partnership,—a relation implying unlimited confidence,—each declaring to the world his confidence in the integrity of the others, and undertaking im-

pliedly to become responsible for the act of each within the compass of the copartnership concerns.   Did Justus Ingersoll, then, in executing the assignment in question, exceed the powers with which he was by law invested? If he did, the assignment must be declared void; as the exercise of an unwarrantable authority would be regarded as a *legal fraud* upon the rights of the complainant.    This question has been discussed and decided in several of the state and federal courts; and applying to it the principles I have laid down, conflicting opinions have been expressed. In the case of *Dickinson* v. *Legare*, 1 Desaus. 537, Chancellor *Matthews* decided that a general assignment of the whole copartnership effects by one of the partners when abroad, without the knowledge or consent of the partners at home, but for a partnership debt, was void.    The correctness of this decision is questioned by Mr. *Collyer*, in his valuable treatise on partnership, and has since been overruled in the case of *Robinson* v. *Crowder*, 4 McCord's R. 519.    In the case of *Havens* v. *Hussey*, 5 Paige's R. 30, the Chancellor declared an assignment of all the partnership effects, executed by one of two copartners, without the consent of the other, and against the known wishes of her agent, void.   In declaring his opinion, the Chancellor remarked, that he had, in the case of *Egberts* v. *Wood*, 3 Paige's R. 517, arrived at the conclusion that, from the nature of the contract of copartnership, one of the partners, during the continuance of the copartnership, might make a valid assignment of the partnership effects, or of so much thereof as was necessary for that purpose, in the name of the firm, to one or more of the creditors, in payment of his or their debts; although the effect of such assignment was to give a preference to one set of creditors over another.    But, as it was not necessary for the decision of that case, he did not express any opinion as to the validity of an assignment of the partnership effects

by one partner, against the *known wishes* of his copartner, to a *trustee*, for the benefit of the favorite creditors of the assignor, in fraud of the rights of his copartner to partici-pate in the distribution of the partnership effects among the creditors, and in the decision of the question as to which of the creditors, if any, should have preference in pay-ment out of the effects of an insolvent concern.   He then declares the assignment to be illegal and inequitable ; and this opinion is founded on the reason, that it is no part of the ordinary business of a copartnership to appoint a trus-tee of all the partnership effects, for the purpose of selling and distributing the proceeds among the creditors in equal proportions; and that no such authority as that can be implied ; but, on the contrary, such an exercise of power by one of a firm, without the consent of the other, is, in most cases, a virtual dissolution of the copartnership.

Such was the reasoning of Chancellor *Farnsworth*, in delivering his opinion in the present case.

In the case of *Egberts* v. *Wood*, Chancellor *Walworth* affirmed the doctrine that, from the nature of the contract of copartnership, one partner might make a valid assign-ment of the partnership effects, in the name of the firm, to one or more creditors, in payment of his or their debts, although the effect might be to give a preference to one set of creditors over another.   In the case of *Havens* v. *Hussey*, the principle decided was, that such an as-signment made by one partner to a *trustee*, against the known wishes of the other, was void.   The distinction, then, between the two cases, is simply this : that in the first case, the assignment is made directly to a creditor, and in the second, the assignment is to a *trustee*, for the *benefit* of a creditor or creditors.   But does such a distinc-tion in fact or in principle exist, as will authorize a court to declare the assignment made directly to a creditor legal, which, if made to a *trustee* for the *benefit* of the same

creditor, is fraudulent and void ?   I have been unable to draw a line of distinction between the two cases.   No reason for such a distinction is given by Chancellor *Walworth*, except that it is no part of the ordinary business of a copartnership to appoint a trustee of all the partnership effects, for the purpose of selling and distributing the proceeds among the creditors, and that no such authority can be implied.   The principle is incontestable, and is fully admitted, that the effects of a copartnership are pledged to the payment of the copartnership debts ; that the members of a firm, or any one member, may sell or assign the whole of those effects to pay the debts owing by the firm, although the effect may be to give a preference to one set of creditors over another.   If these principles be sound, it is difficult to conceive why the same object and purpose may not be accomplished through the agency of a third person or trustee.   The property, it is true, is assigned to him; he may be the *legal* owner; but the creditors have the *beneficial* interest.   Instead of assigning the effects directly to the *creditor*, the assignment is made to a *trustee* for the *benefit of the creditor*.   In other words, the principal thing to be done is the fair and lawful one of paying the debts of the firm.   The *mode* of doing the thing is the mere incident, and ought to be left to the discretion of the party executing the assignment, whose interest, as well as that of the firm, might be greatly promoted by the appointment of a trustee.   In such a case, the trustee is a mere agent appointed to dispose of the effects ; the creditors are the persons beneficially interested ; the assignment enures to their benefit ; so that, in point of fact, there is no real distinction between the two cases.   This seems to me to be the plain common sense view of the question ; and I confess myself unable to discover why an assignment should be stigmatized as fraudulent, when its object is meritorious, simply because in the mode or form of ac-

complishing that object, it should be deemed expedient to appoint an agent or trustee. It is said that each partner has a *right* to be heard in the selection of the trustee, and of the creditors for whose benefit the trust is created. This right does exist; but it does not follow, that an assignment naming a trustee, and the creditors for whose benefit it may be executed, is void, because that right has not been respected. Each partner of a mercantile firm has a right to be consulted in respect to each and every transaction in relation to their joint business ; but it does not follow that every transaction in which the right has not been exercised, is to be characterized as fraudulent. Each partner has a right to be consulted in respect to the amount of purchases the firm may make ; but yet he will be holden to the full amount of such purchases, although he may have never been consulted, and although the purchases may have been made contrary to his express wish. One of several members of a firm may take from the drawer all the funds of the firm, and discharge a debt due a single creditor, without consulting the wishes of his copartners ; yet, such a transaction would be sustained, although the effect might be to prefer one set of creditors to another. I might multiply, indefinitely, instances in which the right to be heard and consulted by the several members of a firm may exist, and yet the most momentous concerns of that firm may be managed and controlled by one of its members, without consultation or advice with the others. The only practical rule, I think, that can be laid down is, that, where the object to be attained, or the thing to be done, is unexceptionable and legal, each partner must exercise a sound discretion as to the mode in which that object is to be effected, or the thing is to be done. If this discretion has been exercised honestly and without *actual* fraud, I know of no reason why the transaction should be pronounced fraudulent.

But if, in the selection of the trustee or agent, or in giving a preference to one class of creditors over another, there are circumstances which induce the belief that *fraud in fact* was meditated, then a court of equity might be successfully appealed to for relief. But in the absence of fraud, either in respect to the object to be attained, or the means of attaining it, I know of no reason why assignments of this nature should be declared void.

The view I have taken of this case, is strongly sustained by the following cases: *Anthony* v. *Butler*, 13 Pet. R. 433; *Harrison* v. *Sterry*, 5 Cranch's R. 289; *Mills* v. *Barber*, 4 Day's R. 425; *Lamb* v. *Durant*, 12 Mass. R. 57; *Anderson* v. *Tompkins*, 1 Brock. R. 456. This last case was decided by Chief Justice *Marshall*, and the whole of his reasoning was directed to the vindication of the power of one copartner to convey the partnership effects, to the creditors of the firm, in payment of their debts, either *directly*, or through the intervention of trustees; and he decides that, if the transaction be *bona fide*, the assignment will not be set aside, although the consent of the other partners was not obtained. " The mode of sale," (says the Chief Justice,) " must, I think, depend on circumstances. Should goods be delivered to trustees, for sale, without necessity, the transaction would be examined with scrutinizing eyes, and might, under some circumstances, be impeached. But if the necessity be apparent, if the act is justified by its motives, if the mode of sale be such as the circumstances require, I cannot say that the partner has exceeded his power."

Upon a careful examination of the bill and answer in this case, I am not prepared to say that the mode of disposing of the effects was not justified by the circumstances of the parties; and if the answer be true, " the act was justified by its motives."

I have not the time, and if I had, I have no disposition

to review the several cases cited by me and referred to by counsel, to sustain the view I have taken upon the question under consideration. They all differ in respect to the facts; but the reasoning of the judges who pronounced opinions, go to confirm the opinion I have formed, that the assignment executed by Justus Ingersoll, to his brother, Nehemiah Ingersoll, must be sustained; and that, to impeach such an instrument, it must appear that the transaction was tainted with fraud.

GOODWIN, J. did not participate in the decision, having taken part in the argument as counsel, before he took his seat upon the bench.

*Decree affirmed.*